UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**EVALYN COFFEE**                                                                                           **PLAINTIFF**

v.                                                                                                          No. 3:18-cv-659-BJB-CHL

**BULLITT COUNTY**                                                                                          **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

Evalyn Coffee hurt her finger at the Bullitt County jail, where she worked as a deputy jailer. Over the next month, she spent two weeks on leave, received workers' compensation benefits, got into a shouting match with the captain who supervised her shift, filed a complaint with the County Judge Executive, called in sick, and received an angry voicemail from the same captain in response. Coffee says the captain fired her in that voicemail; Bullitt County says she abandoned the job by not responding to the voicemail, answering further messages, or returning to work.

After Coffee sued the County on several discrimination claims, the parties conducted limited discovery and the County moved for summary judgment. Based on the evidence in the record, a jury reasonably could find that the County fired Coffee in retaliation for exercising her workers' compensation rights. But no evidence supports required elements of Coffee's disability-discrimination and employment-discrimination claims. So the Court grants the County's summary-judgment motion only in part.

**I.    The material facts in the record**

The record presented here is quite spare. *See* Arg. Tr. at 10:11–13:21. According to counsel, the discovery materials comprise only the parties' initial disclosures, "some written discovery responses," and Coffee's deposition transcript. *Id.* at 12:21–24, 13:15–21. The docket also reflects subpoenaed medical records, and the County's motion attached affidavits from two supervisors (but not the captain in question). Although Bullitt County moved for summary judgment months before discovery closed, *see* Scheduling Order [DN 13], by now all discovery deadlines have passed without objection, *see, e.g.,* Joint Status Report [DN 39].

Even if additional discovery might've been illuminating, however, Federal Rule of Civil Procedure 56 focuses the Court's summary-judgment analysis on the materials the parties have placed before it—or at a minimum placed in the record. Rule 56(c)(1)(A) instructs that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to *particular parts of materials in the record*…." And subsection (c)(3) allows that "[t]he court need consider only the cited materials, but it *may* consider other materials *in the record*." Fed. R. Civ. P. 56(c)(3) (all emphases added). Here, the summary-judgment papers rely on only a small amount of record evidence, and the entirety of the discovery materials is apparently not much larger. Rule 56 requires parties, not judges, to identify "*evidence that is already in the record*" in order to

show either the lack or the existence of "an issue of fact" that determines whether summary judgment is appropriate. *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007) (emphasis in original); *see also 715 Spencer Corp. v. City Env't Servs.*, 80 F. Supp. 2d 755, 760 n.3 (N.D. Ohio 1999) (a district court cannot consider evidence not in the record on summary judgment).

Despite the limited record, however, most of the relevant events are clear enough. The only narrative account appears in Coffee's deposition—an account that would be viewed in its most favorable light in any event, since Coffee is the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). What the parties dispute most vigorously are the conclusions a jury could reasonably draw from those events.

\* \* \*

Evalyn Coffee worked as a deputy jailer at the Bullitt County Detention Center from December 2015 until December 2017. During a shift on November 15, 2017, Coffee injured her finger. Coffee Dep. Tr. [DN 40-1] at 69:22–25. What exactly happened to the finger, and how, are not entirely clear. *See, e.g., id.* at 27:25–30:5. While in the emergency room that evening, Coffee called Captain Haskell Farmer, an official who outranked her at the jail, asking about Bullitt County's workers' compensation doctor. *Id.* at 75:15–20. Farmer did not know whom Coffee should contact, but Coffee eventually got in touch with the right person and obtained workers' compensation benefits for her injury. *Id.* at 58:1–9; 138:18–139:4. Coffee remained off work because of the finger injury until December 5th, and apparently received workers' compensation benefits for her lost wages during that period. *Id.* at 148:13–14.

Four days after her injury, Coffee briefly went to the jail to write a report the jail required of its employees in response to any on-site injury.. Arg. Tr. at 7:8–14. While there, she ran into an "angry" Captain Farmer. Dep. Tr. at 95:8. Farmer directed Coffee to another room, reviewed her incident report, and "leaned into [her] right ear and started yelling." *Id.* at 96:5–19. Coffee yelled at Farmer, too, and they both screamed at each other for an extended period of time. *See* Arg. Tr. at 8:19–9:7 (counsel agreeing that "both folks were yelling at each other" during "a mutual shouting match"); Dep. Tr. at 97:6–11; 98:2–7 (describing Farmer and then Coffee yelling at each other for "two or three minutes"). According to Coffee, Farmer shouted that "we all know what you are trying to do." Dep. Tr. at 96:19–21. Later that day, Coffee attempted to discuss the incident with Martha Knox—who served as the Bullitt County Jailer and Farmer's boss—but Knox dismissed Coffee's concerns. *Id.* at 111:7–112:12.

On December 5, Coffee's doctor cleared her to return to work with lifting restrictions. Those restrictions prohibited her from performing her normal job functions, so Coffee worked what she described as "light duty" in the jail's control room. *See id.* at 148:2–20, 152:6–17; Doctor's Note [DN 40-3] at 2.

After her return to work, Coffee tried to inform her superiors of her concerns about Farmer's November 19th shouting and his continued supervisory relationship with her. Coffee first approached Mitzi Burkhead, a captain on par with Farmer. Dep. Tr. at 120:16–121:2; 123:17–124:9. Coffee explained her concerns about Farmer's conduct; she also disclosed inappropriate, sexually explicit comments that Farmer had allegedly made about Burkhead. *Id.* at 120:23–24;

123:24–124:8. Coffee told Burkhead that Farmer made these explicit statements over a period of several months nearly a year before. *Id*. at 116:4–117:7. Burkhead took no action. Burkhead Affidavit [DN 27-7] at 1.

Coffee raised the same concerns about Farmer's behavior in communications with Knox, the jailer. Coffee first complained in a phone call to Knox on November 19th, immediately after her shouting match with Farmer. Dep. Tr. at 130:5–13. Knox was unreceptive. *Id*. at 135:14–136:11. When Coffee returned to work in December, she again texted Knox about her concerns with Farmer. Coffee told Knox that "I did not want to work up under [Farmer's] command because of the retaliation [that] had started after I hurt myself and the way that he treated me on the 19th." *Id*. at 127:5–10. Knox apparently did not respond before the next Coffee-Farmer altercation in December. *Id*. at 129:25–130:5.

Coffee escalated her complaints to the Bullitt County Judge Executive on December 13th. *Id*. at 134:17–135:10. She discussed Farmer's November 19th shouting, her concerns about working for Farmer, and Knox's and Burkhead's dismissiveness. *Id*. at 135:1–10. Coffee's counsel argues she also complained about Farmer's sexually charged comments about Burkhead. Opposition [DN 40] at 9. Neither the deposition transcript nor the pleadings explicitly support this position, though. The Judge Executive and one staffer (identified in the record only as "Lisa") helped Coffee write an official complaint, which Coffee apparently submitted to Knox (but which is not part of the record). Dep. Tr. at 137:5–138:9.

Four days passed before Coffee called in sick to work on December 17th. Her shift started at 3:45 p.m. She called the jail around 11:30 a.m. and talked to the on-duty supervisor. *Id*. at 174:11–25. The supervisor agreed to notify Farmer that Coffee would be out sick. *Id*. at 175:3–7. When Coffee's shift started, however, she received a voicemail from Farmer. Coffee testified in her deposition that she believed Farmer fired her in this phone call. *Id*. at 183:7–9. She recounted him telling her "there's no longer any work for [her], do not report to the jail, because [Coffee] did not call him personally" when she called in sick. *Id*. at 177:22–178:1.

The lack of a "persona[l]" call was significant, Bullitt County contends, because Coffee violated jail policy by calling in sick to the supervisor then on duty, rather than the supervisor who would be working the shift the employee would miss. *See* Knox Affidavit [DN 27-6] at 1. The County policy states that "[t]he supervisor must be notified two hours before the beginning of the shift" if an employee will be out sick. Handbook [DN 40-5] at 35, § 16.3(6). Bullitt County maintains in litigation that "the supervisor" refers specifically to the employee's shift supervisor, not to just any supervisor. Summary Judgment Motion [DN 27-2] at 4; Knox Affidavit at 1.

The day after Farmer's voicemail, Coffee received a phone call and a text message from Knox. She left a voicemail asking Coffee to call her back to "talk about your employment and the … complaint that you left." Dep. Tr. at 179:2–8. Coffee did not answer or respond. *Id*. at 179:9–11. The next day, for reasons that remain unknown, Coffee wrote a summary of the events.[1] It recounted Farmer's December 17th voicemail, stating that he told her "you called in today, you

---

[1] Coffee apparently disclosed this summary in her initial disclosures. Arg. Tr. at 17:16–18:7. The parties have not offered any evidence or explanation that would shed light on where or why Coffee wrote the summary.

did not call me … you are not to report back to the jail until you have a meeting with Martha Knox." Summary of Events [DN 41-1]. Coffee also wrote that "I Evalyn D. Coffee still have not been removed from under Captain Haskell Farmer Jr.'s command and his hostile environment." *Id*.

A few days later, Coffee received a final payment for her unused sick days and a notice from her health insurer that her employer-provided insurance was ending. Dep. Tr. at 184:5–19. On December 26th or 27th, Knox called Coffee, asking her to return her uniforms, keys, and badge. *Id*. at 184:20–24.

After exhausting her administrative remedies through the EEOC and receiving a right-to-sue letter, Coffee sued the County. Arg. Tr. at 11:13–23. Her lawsuit currently includes three causes of action: (1) disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12112; (2) retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a); and (3) workers' compensation retaliation under the Kentucky Workers' Compensation Act, Ky. Rev. Stat. § 342.197(1).[2]

## II. Analyzing discrimination claims at summary judgment

Rule 56(a) of the Federal Rules of Civil Procedure requires that a court grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When a plaintiff relies on indirect evidence (as Coffee does here[3]) to pursue the types of claims that remain in this case, courts employ the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973); *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (applying *McDonnell Douglas* burden-shifting to Title VII retaliation claim); *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (Americans with Disabilities Act discrimination); *Benningfield v. Fields*, 584 S.W.3d 731, 738–39 (Ky. 2019) (Kentucky workers' compensation retaliation).

Under the *McDonnell Douglas* framework, Coffee must first set forth a prima facie case of discrimination. *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020). If she does, the burden shifts to Bullitt County to "articulate some legitimate, non-discriminatory reason for [its] actions." *Id*. (quoting *Laster*, 746 F.3d at 730). Once the County does so, the burden shifts back to Coffee to point to evidence that the County's proffered reason was merely pretext for unlawful discrimination. *Id*.

---

[2] Coffee's complaint alleged three additional causes of action: FMLA interference, FMLA retaliation, and Title VII sexual harassment. Coffee abandoned those claims at summary judgment. Opposition at 6 n.1.

[3] This case involves "indirect evidence" (and therefore a five-part prima facie test), not "direct evidence" (and its three-part test discussed below), because the employer has *not* "acknowledge[d] that it relied upon the plaintiff's handicap in making its employment decision." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 892 (6th Cir. 2016).

**III.    Whether the County terminated Coffee is a genuinely disputed issue of material fact**

Each of Coffee's three causes of action require her to prove an "adverse employment action" as an element of her prima facie case. *See Laster*, 746 F.3d at 730 (Title VII); *Whitfield*, 639 F.3d at 258–59 (Americans with Disabilities Act); *Benningfield*, 584 S.W.3d at 738–39 (Kentucky workers' compensation retaliation). Whether the County terminated Coffee—the alleged adverse action—is an objective inquiry: would "a reasonable employee … have found the challenged action materially adverse"—that is, would the employee have understood that the employer fired her? *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (objective inquiry); Arg. Tr. at 18:21–19:6 (parties' agreement with this framing); *Fletcher v. U.S. Renal Care Inc.*, 240 F. Supp. 3d 740, 750 (S.D. Ohio 2017) ("objective evidence," not employee's "subjective fear," determined whether company terminated employee).[4] The reasonable-employee standard poses a question of fact, not law. *See Sander v. Gray Television Grp., Inc.*, 478 F. App'x 256, 263 (6th Cir. 2012) (treating the question whether a plaintiff quit or was fired as a factual inquiry); *Branham v. Thomas M. Cooley Law School*, No. 1:07-cv-630, 2008 WL 5071700, at *13 (W.D. Mich. Nov. 24, 2008) ("whether Branham quit or was fired is really a question of fact ….").[5]

The County's principal argument on summary judgment is that it took no adverse employment action against Coffee. The County contends it didn't fire Coffee; she just "abandoned" her job. Motion at 18–19, 27–28. Abandonment, the County concedes, is not a specific legal defense or term of art. Arg. Tr. at 19:11–19. Rather, as applied here it appears to be a real-world variant of a familiar comedy trope: "You can't fire me. I quit!" Only Coffee never told the County she quit, and the County never told her she was fired—at least not in those terms. According to the County, anyway, she just stopped returning messages and stopped coming to work. *See generally* OFFICE SPACE (1999) (Joanna: "So you're gonna quit? Peter: Nuh-uh. Not really. I'm just gonna stop going.").

This distinction is important. If the County didn't actually fire Coffee, then she suffered no adverse employment action and lacks a necessary factual foundation for all three of her claims. This would entitle the County to summary judgment across the board.[6]

---

[4] The Sixth Circuit also has applied this objective-reasonable-employee standard to the similar question whether an employee was constructively discharged. *See Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 814 (6th Cir. 2020) (applying *Brooks v. Lexington-Fayette Urb. Cnty. Hous. Auth.*, 132 S.W.3d 790, 807 (Ky. 2004)).

[5] The ADA and Title VII claims also require the adverse employment action to be "material." Termination is undisputedly material.

[6] Both sides treat abandonment as a question about adverse action, and the Court lacks any basis for recharacterizing their own dispute. Though it's hardly clear that abandonment concerns *whether*, rather than *why*, an employee was fired. Indeed, many cases have framed the inquiry around whether the employee's failure to come to work gave the employer a nondiscriminatory reason for firing the employee. *See, e.g., U.S. Bank Home Mortg. v. Schrecker*, 455 S.W.3d 382, 383 n.1 (Ky. 2014); *Harris v. Burger King Corp.*, 993 F. Supp. 2d 677, 686 (W.D. Ky. 2014); *Giles v. Univ. of Toledo*, 286 F. App'x 295, 299–300, 304 (6th Cir. 2008). Likewise, Jailer Knox's affidavit conveys that the County did in fact terminate Coffee (an adverse action), but did so for two reasons she viewed as legitimate: her not showing up to work and not calling in sick to the correct shift supervisor. Knox Affidavit ¶ 10 ("Ms. Coffee was terminated because

Coffee of course disagrees. According to her deposition testimony and brief, Farmer fired Coffee when he told her not to come back to work after she called out sick on December 17th.

With one exception, the parties largely agree on what happened. As described above in Part I, Coffee hurt herself at work, used her sick leave, and received workers' compensation benefits. Coffee and Farmer got into a shouting match at work regarding her leave. Coffee returned to the jail and complained about Farmer to the jailer and the Judge Executive. When Coffee called in sick, about a month after her injury and two weeks after her return, she called a different supervisor—not her shift supervisor Farmer—to give notice. Farmer left her a voicemail telling her not to come back. The jailer called and texted Coffee, who didn't respond. But Coffee did write out a statement (of unknown provenance) complaining that she was still serving under Farmer. Within a few days, the County cancelled her health insurance and paid out her unused sick days. Then Coffee received another message from the jailer asking her to return her work gear to the jail.

The one major factual dispute is whether Farmer's voicemail told Coffee not to come back *at all* or not to come back *until she talked to their boss*.

The record, viewed in the light most favorable to Coffee, includes evidence supporting each formulation. Coffee testified that Farmer told her "there's no longer any work for [you], do not report to the jail." Dep. Tr. at 177:22–25. But Coffee's handwritten report, dated two days after the voicemail and one day after the jailer sent her two messages, may be read to suggest she considered herself still employed by the County, still working under Farmer, and not yet fired. On its face, the note states that Farmer required her to meet with Knox before returning to work:

> At 3:45 pm Captain Haskell Farmer Jr. called myself (December 17th 2017) and stated "you called in today, you did not call me or Stottman you are not to report back to the jail until you have a meeting with Martha Knox (Department Executive) you can call her from their [sic] <u>do not report to the jail for any work</u>." I Evalyn D. Coffee still have not been removed from under Captain Haskell Farmer Jr's command and his hostile environment.

DN 41-1 (emphasis in original).

Do not come back "until you have a meeting" obviously differs significantly from do not come back, *period*. And some corroboration supports the letter's account: the jailer did, in fact, call Coffee to discuss her employment. Dep. Tr. at 179:5–8.

Procedurally, however, reliance on this statement is problematic for a number of reasons.

*First*, contrary to Rule 56(c), Bullitt County did not identify this statement in its motion or the supporting materials. A "party asserting that a fact cannot be or is genuinely disputed must

---

of Coffee's violation of the call-out policy and Ms. Coffee's abandonment of her job."); *see also* Arg. Tr. 32:15–18 (Defense counsel: "[W]e didn't affirmatively put evidence of how this [call-out] policy was applied in a similar fashion … into the record. Probably because, *primarily*, we view it as a voluntary resignation.") (emphasis added).

6

support the assertion by" citing "particular parts of materials in the record…." Fed. R. Civ. P. 56(c). The County's motion did not cite the letter.

*Second*, and relatedly, the handwritten report appeared for the first time in the County's reply brief. Courts regularly deem moving parties to have waived arguments raised for the first time in reply briefs, partly because the practice "depriv[es] the Court of the benefit of briefing from both parties on th[e] issue." *Fenwick v. Hartford Life & Accident Ins. Co.*, 457 F. Supp. 3d 603, 626 (W.D. Ky. 2020); *see also Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("[T]he non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived.") (quoting *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)).

*Third*, the note relays apparent hearsay. The County may introduce the words of Coffee, the party opponent, of course. Fed. R. Evid. 801(d)(2)(A). But what about the double-hearsay of Coffee quoting Farmer? Perhaps it would come in for its reflection of Coffee's subjective belief at the time, rather than for its truth; or perhaps it would impeach Coffee's testimony; or perhaps it would come in based on counsel's apparent agreement that the Court may consider it, *see* Arg. Tr. at 17:16–22. But these theories—none of which have been argued or briefed—would lay a shaky foundation for summary judgment.

Major substantive questions also remain about this note. Closely related to the hearsay issue are the origin and nature of the statement itself: why did Coffee write this note? Were Farmer, Knox, or any others around? What indicia of reliability support this version of the conversation? The Court has no way of knowing at this stage, and therefore struggles even to contemplate, with any degree of confidence, whether and how a jury could weigh this potentially critical evidence.

The written statement—assuming it is admissible—would be laid against Coffee's own testimony. At her deposition she described Farmer speaking rather more categorically in telling her "do not report to the jail." Dep. Tr. at 177:22–178:1. And at trial the jury presumably would weigh her testimony and letter alongside trial testimony from Farmer himself, who hasn't been heard from by either deposition or affidavit. The credibility and weight assigned these differing versions of the same event could vary considerably. Which is why this is a consummate task for the jury, not for the Court on a cold and limited summary-judgment record. *See Weaver v. Caldwell Tanks, Inc.*, 190 F. App'x 404, 408 (6th Cir. 2006) ("[C]redibility determinations must be left to the fact-finder.").

A genuine dispute of fact therefore prevents Bullitt County from obtaining an adverse-action ruling on summary judgment that would decide all three claims in its favor. So the Court turns to the County's remaining arguments, which are specific to the differing elements of the three distinct types of discrimination claims.

### IV. Coffee's ADA claim fails

Title I of the Americans with Disabilities Act prevents a qualifyied employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To make out a prima facie case of discrimination (by firing) based on disability, Coffee must show: (1) she was disabled; (2) she was otherwise qualified for the position "with or without reasonable accommodation"; (3) she suffered a materially adverse action; (4) the County knew or had reason to know of her disability; and (5) the position remained open while the County sought other applicants or Coffee was replaced. *Whitfield*, 639 F.3d at 258–59 (quoting, *e.g.*, *Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173, 1186 (6th Cir.1996)).

Coffee rests her ADA discrimination claim on her finger injury. She alleges that the injury is an ADA-qualifying "disability," that she ably performed her job with reasonable accommodations after the injury, and that—but for the injury—the County would not have terminated her. Opposition at 6–8. Bullitt County disagrees that the injured finger counts as a disability under the ADA, Motion at 15–17, but offers no factual or legal response to Coffee's evidence that could warrant summary judgment, Opposition at 6–7.

Even assuming Coffee's finger injury qualifies as an ADA disability, her discrimination claim nevertheless fails because she points to no evidence that could satisfy the fifth element of her prima facie case: that "the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield*, 639 F.3d at 259.

As Bullitt County's motion and reply contended, and as Coffee's counsel acknowledged at argument, Arg. Tr. at 22:22–23:16, no evidence before the Court indicates the County replaced Coffee or kept the position open while it sought other applicants. Courts look to such evidence to support the inference that an employer terminated an employee because of an impermissible reason, rather than, say, a reduction in force or change in business needs. *See Sukari v. Akebono Brake Corp.*, 814 F. App'x 108, 112 (6th Cir. 2020) (no presumption of discrimination because employer distributed plaintiff's duties among several co-workers); *Webb v. ServiceMaster BSC LLC*, 438 F. App'x 451, 454 (6th Cir. 2011) (no presumption of discrimination because employer restructured plaintiff's department upon his departure, leaving "no exact replica" of plaintiff's job). Coffee's response simply did not address this element. *See* Reply [DN 41] at 7.

The reason, at least in part, is that Coffee relied on another line of Sixth Circuit caselaw involving a three-part prima facie case that applies to cases involving direct, rather than indirect, evidence of discrimination. *See* Response at 6 (citing *Talley v. Family Dollar Stores of Ohio*, 542 F.3d 1099, 1105 (6th Cir. 2008), which in turn cites *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002)). *Talley* and *Mahon* required that plaintiffs establish that they were (1) disabled, (2) otherwise qualified, and (3) discriminated against solely because of disability. *Id*. This three-part test used in *Talley*, however, should have been limited to cases involving direct rather than indirect evidence of discrimination, as the Sixth Circuit subsequently and helpfully explained. *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891–92 (6th Cir. 2016). When an employer acknowledges it accounted for a disability in the employment decision (making it a direct-evidence case), the employee need not satisfy the five-part test discussed above; only in indirect-evidence cases must the employee also indicate that the employer knew about the disability before the adverse action and kept the position open or replaced the employee. *See Ferrari*, 826 F.3d at 894–95.

Coffee's formulation cannot withstand the binding precedent of this Circuit. The Sixth Circuit, in *Whitfield* and subsequent decisions, has explicitly repudiated reliance on *Talley* in

indirect-evidence cases. *Whitfield*, 639 F.3d at 259 & n.2. "In some cases," including *Talley*, the Court of Appeals has explained, "we have continued to cite the line of authority we rejected in *Whitfield*. These cases rely on *Mahon*'s misreading of our published precedent." *Ferrari*, 826 F.3d at 894–95 (string-citation omitted). Although the Sixth Circuit has never explicitly overruled *Mahon*, it repeatedly has made clear that "*Monette* states the proper test." *Whitfield*, 639 F.3d at 259 (collecting cases); *see also Ferrari*, 826 F.3d at 895 ("The five-element test previously articulated in *Monette* remains the proper test."), *abrogated on other grounds by Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019).

The Court is mindful that some of these precedents, which post-date *Monette*, may cause confusion. Yet the binding law of this Circuit requires evidence that Coffee was replaced or the position remained open. Coffee was on notice of this argument and authority based on Bullitt County's motion (and reply), yet has not identified anything in the record that could support her claim before a jury. Arg. Tr. at 23:9–16.

In any event, it bears noting that even if the three-part *Talley* test *did* apply, Coffee appears not to have identified any evidence that she was fired *because of* her finger injury (as opposed to her actions following that injury), as the law requires of an ADA discrimination claim, *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc) (ADA discrimination claim requires but-for causation).

### V. Coffee's Title VII claim fails

Title VII prohibits an employer from discriminating against an employee, as relevant here, "because [s]he has opposed any practice made an unlawful employment practice by" that law. 42 U.S.C. § 2000e-3(a). A prima facie case of Title VII retaliation requires Coffee to show: "(1) [s]he engaged in activity protected by Title VII; (2) h[er] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to [her]; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster*, 746 F.3d at 730 (quotation omitted). "[C]omplaints to human resources personnel" may constitute protected activity under Title VII's opposition clause, but only if the complaint is "sufficiently specific." *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012). A "vague charge of discrimination" is not sufficient. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1314 (6th Cir. 1989).

Coffee's Title VII retaliation claim proceeds under the "opposition clause." *See* 42 U.S.C. § 2000e-3(a) (protecting individuals who "opposed any practice made an unlawful employment practice by this subchapter"). Coffee asserts that she engaged in "protected activity" when she told the Judge Executive about Farmer's alleged statements of harassment about Burkhead. Opposition at 9. And she alleges that the County fired her in retaliation for reporting this conduct.

But Coffee's Title VII retaliation claim fails the first element because she has not pointed to evidence that she engaged in "protected activity" under Title VII. Coffee argues that her report to the Judge Executive is the protected activity she undertook and was fired for. Yet her own description of the report indicates that Coffee did not complain about sexual harassment with

9

respect to Burkhead. Instead, Coffee acknowledges that she went to the Judge Executive to complain about Farmer's treatment of herself (not Burkhead) in November 2017 (not 2016):

> Then, on [December] 13th, I went to the judges[7] and asked them—when I asked for a complaint and they told me that they didn't have one, they brought me into their office and I complained about what happened on the 19th about Captain Farmer's behavior and Martha [Knox]'s, when she blew me off on the phone, and then when I s[aw] her on the 20th, and when I texted her on the 6th, and then when I talked to Mitzi [Burkhead] on the 7th, all of it I complained to the judges about.

Dep. Tr. at 135:1–10.[8]

When asked why she complained to the Judge Executive, Coffee said she "was mad because of the way that Captain Farmer treated *me*, the way that Martha [Knox] was treating *me* and ignoring *me*." *Id*. at 125:25–126:2 (emphasis added). She apparently did not mention Burkhead or sexual harassment—just her own alleged mistreatment by one of her supervisors. The sort of employment practice whose reporting Title VII would protect, however, involves adverse action taken *because of* race, sex, or another protected status. *See Canitia v. Yellow Freight Sys.*, 903 F.2d 1064, 1068 (6th Cir. 1990) (Title VII plaintiff "must establish that the decision complained about as retaliatory would not have been made 'but for' the protected status of the plaintiff."). Undifferentiated workplace mistreatment does not give rise to a Title VII unlawful employment practice. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) ("While [plaintiff] may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender.").

No facts indicate that Farmer treated Coffee poorly, or that Knox ignored Coffee, *because of* her objections to prior comments about her colleague's sex. The only potential unlawful employment practice here concerned Farmer's alleged comments about Burkhead. And Coffee points to no evidence indicating she mentioned those comments to the Judge Executive at all. Or that any such comments were known to Farmer before he left the voicemail that allegedly fired Coffee. Instead, her complaint to the Judge Executive (as supported in the record, anyhow) only mentioned Farmer's and Knox's treatment of Coffee herself. Thus, when she complained to the Judge Executive about that treatment, no evidence indicates she was opposing an unlawful employment practice covered by Title VII.

Thus Coffee has not identified any evidence that she in fact engaged in protected activity under Title VII, much less was fired by Farmer as a result of it. *See, e.g., Scheske v. Univ. of Michigan Health Sys.*, 59 F. Supp. 3d 820, 828 (E.D. Mich. 2014) ("Plaintiff's presentation to Dr.

---

[7] The deposition transcript and parties' arguments do not make clear why Coffee referred to more than one judge. It is possible, though hardly clear, that she is referring to multiple people within the County Judge Executive's office. As noted above, her testimony referred to "Lisa," an otherwise unidentified person who apparently helped Coffee complete a complaint in the Judge Executive's office. Dep. Tr. at 137:5–138:9. Neither party offered any explanation for this elision, or any reason to believe it has any bearing on the claims at issue.

[8] Coffee states that she filed a formal complaint memorializing these concerns. Dep. Tr. at 138:4–9. But that complaint does not appear in the record. Arg. Tr. at 10:11–23.

Mulholland is not a protected activity because it did not put Defendant on notice that Plaintiff was opposing a discriminatory practice."). The Sixth Circuit has affirmed summary judgment on similar facts. In *Willoughby v. Allstate*, the plaintiff sent a letter to his employer that mentioned previous sexual harassment complaints about a co-worker. 104 F. App'x 528, 529 (6th Cir. 2004). Although the letter mentioned sexual harassment complaints, the pertinent section of the letter "read[ ] as if Willoughby [wa]s trying to impeach [the employee]'s credibility," not complain about sexual harassment. *Id*. at 530–31. The court stated that "[t]he 'vague charge of discrimination in [plaintiff's] internal letter is insufficient to constitute opposition to an unlawful employment practice.'" *Id*. at 531 (quoting *Booker*, 879 F.2d at 1313). As in *Willoughby*, Coffee complained to the supervisor because—by Coffee's own description—she "was mad because of the way that Captain Farmer treated [her]." Dep. Tr. at 125:25–126:2. No evidence indicates that she was fired because she complained about sexual statements Farmer made about another employee a year earlier.

## VI. A genuine factual dispute exists regarding Coffee's workers' compensation discrimination claim

Kentucky law states that "[n]o employee shall be harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a lawful claim" for workers' compensation benefits. Ky. Rev. Stat. § 342.197(1). A prima facie case of workers' compensation discrimination requires a plaintiff to show: (1) protected activity, (2) the defendant's knowledge of the protected activity, (3) adverse employment action, and (4) causal connection between the protected activity and the adverse employment action. *Benningfield v. Fields*, 584 S.W.3d 731, 738–39 (Ky. 2019) (quoting *Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 915 (Ky. Ct. App. 2006)).

If Coffee makes the prima facie showing and the County produces a legitimate nonretaliatory reason for her termination, the burden shifts back to Coffee to prove that "the legitimate reasons offered by the defendant were not its true reasons but were a pretext for retaliation." *Upchurch*, 214 S.W.3d at 916 (quoting *Ky. Dep't of Corr. v. McCullough*, 123 S.W.3d 130, 134 (Ky. 2003)). Coffee ultimately must prove, by a preponderance of the evidence, that her workers' compensation claim "was a substantial and motivating factor but for which [s]he would not have been discharged." *Colorama, Inc. v. Johnson*, 295 S.W.3d 148, 152 (Ky. Ct. App. 2009).

Coffee's theory of liability on this claim is that Bullitt County terminated her because she filed a workers' compensation claim. Opposition at 10–14. Coffee indisputably sought workers' compensation benefits after her finger injury. Arg. Tr. at 5:19–6:16. And Farmer knew this: he was at work when she injured her finger, and later that evening he fielded a call from Coffee asking about the County's workers' compensation doctor. As Coffee sees it, once Farmer knew Coffee was filing workers' compensation benefits, he repeatedly retaliated against her. *See* Opposition at 2–4.

Bullitt County contends that even assuming Coffee has set forth a prima facie case, the Court should still grant summary judgment because Coffee cannot show the County's nondiscriminatory reasons for termination were pretextual. Motion at 29. And Bullitt County

11

indeed offered a nondiscriminatory reason for Coffee's termination: she violated the jail's "call-out policy" on December 17th by calling in sick to the wrong supervisor.[9]

The burden thus shifts back to Coffee to establish pretext. That means Coffee must provide evidence that the County's nondiscriminatory reasons "were not its true reasons" for termination, and that retaliation for filing a workers' compensation claim was a "substantial and motivating factor" in her termination. *Upchurch*, 214 S.W.3d at 916. This is a holistic inquiry in which no single fact is dispositive. *Id*.

Coffee raises three arguments that Bullitt County's nondiscriminatory reasons were pretext for unlawful retaliation: (1) the lack of a credible factual basis supporting the County's purportedly nondiscriminatory reason; (2) the temporal proximity between her workers' compensation claim and termination; and (3) Farmer's angry statements on November 19th. Opposition at 11–14. Considered together, these evidentiary arguments would provide a jury with a sound basis to agree that Bullitt County's proffered nondiscriminatory reason for termination was actually a pretext for discrimination in response to Coffee's use of her workers' compensation benefits.

*First*, the County contends Coffee violated the employee handbook when she called in sick to a supervisor on a different shift (rather than her own shift supervisor) on December 17th. This, the County asserts, provides a bona fide basis for Coffee's firing. Termination might seem an unusually harsh sanction for someone who did, after all, call in sick to a supervisor—just the wrong one. Indeed, as a purely textual matter, the County doesn't point to anything in the handbook that would require Coffee to call her own shift supervisor, as opposed to someone else of similar rank and authority. Motion at 28; Handbook [DN 40-5] at 35, § 16.3(6). The County maintains that jail personnel knew they needed to call the jail supervisor from their own shift, but provides no evidence of this and no reason why a departure from this alleged custom amounted to a fireable offense. Arg. Tr. at 31:8–32:18. Given the lack of evidence supporting the County's reading of the handbook, Coffee has raised legitimate doubts that suggest the County's nondiscriminatory reason is "unworthy of credence." *Upchurch*, 214 S.W.3d at 916.

*Second*, Coffee's termination occurred only one month after she filed for workers' compensation. Opposition at 11. When combined with additional evidence, this close temporal proximity may raise an inference of discrimination. *See Hill v. Nicholson*, 383 F. App'x 503, 514 (6th Cir. 2010) ("[W]hile temporal proximity … cannot alone prove pretext, temporal proximity can be used [as] indirect evidence to support an employee's claim of pretext.") (quoting *Asmo v. Keane, Inc.*, 471 F.3d 588, 598 (6th Cir. 2006)) (alterations in original); *Bush v. Compass Grp. USA*, 683 F. App'x 440, 454 (6th Cir. 2017) ("[U]nder Kentucky law, temporal proximity between a worker's protected activity and an adverse employment action" may support retaliation when combined with additional facts, though it "is generally insufficient to sustain a retaliation claim" on its own.).

---

[9] Bullitt County also suggests Coffee's job "abandonment" was the second nondiscriminatory reason it terminated Coffee. Motion at 28–29. But regardless of whether we treat the abandonment question as addressing adverse action or nondiscriminatory reason, *see* n.5 above, a genuine issue of fact exists regarding whether Coffee abandoned her job in lieu of any termination*, see* Part III above.

*Third*, Coffee has identified additional evidence of retaliation: her November 19th altercation with Farmer. Coffee asserts that, during the shouting match that ensued when she appeared at work to complete a required onsite-injury form, Farmer told her that "we all know what you're trying to do" and "turned red and … was shaking" because he was yelling so loud. Dep. Tr. at 96:18–97:11. This altercation occurred in Coffee's first return to the jail after her finger injury, only four days after she suffered the injury, and four days after she called Farmer to ask about the workers' compensation doctor. *Id*. at 75:15–20. Although Farmer never made explicit what he thought Coffee was "trying to do," a reasonable jury might conclude he made that statement in response to Coffee's workers' compensation claim.

Considering these three arguments together, Coffee has identified evidence that would allow a reasonable jury to find that Coffee's workers' compensation claim was a "substantial and motivating factor" in Bullitt County's ultimate decision to terminate her. *Colorama*, 295 S.W.3d at 152; *Upchurch*, 214 S.W.3d at 916. Summary judgment is not appropriate for this claim.

## VII. Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Bullitt County's Motion for Summary Judgment [DN 33]. The Court **GRANTS** Bullitt County's motion on Counts I–V and **DENIES** Bullitt County's motion on Count VI.

Benjamin Beaton, District Judge
United States District Court

April 28, 2021

cc:   Counsel of Record